# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DAVID SOLIMA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00338** |
| | ) | **Judge Aleta A. Trauger** |
| **CITY OF BRENTWOOD,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is defendant City of Brentwood's Motion for Summary Judgment (Doc. No. 39), seeking judgment in its favor on plaintiff David Solima's claims under the Age Discrimination in Employment Act ("ADEA") and 42 U.S.C. § 1983. For the reasons set forth herein, the motion will be granted.

## I.  SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect

the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

In its Reply, the City argues that the plaintiff's failure to respond to its arguments regarding whether he has direct evidence of age discrimination or whether he can establish a substantive due process claim amounts to abandonment of these claims. (Doc. No. 53, at 3, 11.) Indeed, the Sixth Circuit has repeatedly stated that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006); *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 24–25 (6th Cir. 2003)). At the same time, however, in

reported opinions, the Sixth Circuit has made it clear that a district court faced with a plaintiff's failure to respond, in whole or in part, to a motion for summary judgment "[may] not use that [failure] as a reason for granting summary judgment without first examining all the materials properly before it under Rule 56(c)." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) (quoting *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979)). The district court retains this obligation, because "[a] party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (quoting *Smith*, 600 F.2d at 64). Consequently, despite the plaintiff's silence in response to some of the defendant's arguments, the court "must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists" before granting summary judgment on those particular claims. *Id.*

## II.     STATEMENT OF FACTS

### A.     The Defendant's Statement of Undisputed Facts[1]

The City of Brentwood ("City") is a municipality located within Williamson County, Tennessee. It has adopted the Commission-City Manager form of government. It owns and operates a Department of Public Works. (Doc. No. 41-1, Bednar Decl. ¶¶ 3, 5.) The City's Department of Public Works provides ongoing maintenance services necessary to protect the City's infrastructure. (*Id.* ¶ 9.) Todd Hoppenstedt is the City's Director of Public Works and held that position during the relevant time period. (*Id.* ¶ 10.)

The City has in place Personnel Rules and Regulations. Pursuant to Article IX of the Personnel Rules and Regulations, "[i]t is the policy of the City that all new employees in regular

---

[1] The facts set forth herein for which no citation is provided are drawn from the plaintiff's Response to the defendant's Statement of Undisputed Material Facts (Doc. No. 47) and, unless otherwise indicated, are undisputed or viewed in the light most favorable to the plaintiff.

full-time, part-time and temporary positions will be placed on probationary status." (Doc. No. 41-1, at 30.) With certain exceptions not relevant here, "all new employees in regular full-time, regular part-time and temporary positions shall be in a probationary status for six (6) months from the date of hire." (*Id.*) Further, "[a]t any time during or upon the conclusion of the initial probationary period, an employee may be dismissed by the employee's respective department head with or without cause and with no right to appeal as provided for regular employees herein." (*Id.*)

With respect to employees who are retained through the end of their probationary period, Article IX states that "[t]he supervisor shall evaluate the performance of the probationary employee . . . by no later than the end of the sixth month." (*Id.*) Article IX further provides that, "upon completion of the probationary period, the department head shall review the evaluations and recommend to the Human Resources Director and to the City Manager whether regular full-time or part-time status should be conferred, the probation extended for up to six (6) additional months, or the employee dismissed."

On August 6, 2018, the City hired Solima as a maintenance worker in the Public Works Department. At the time, Solima was more than forty years old.[2] Once employed as a maintenance worker, Solima was often partnered with a fellow Public Works employee as a member of a "chipper crew." Within a period of five months, Todd Hoppenstedt assigned Solima to work with four different partners on the chipper crew. (Hoppenstedt Decl., Doc. No. 41-2 ¶ 8.)[3] According to

---

[2] The plaintiff alleges in the original Complaint that, when the lawsuit was filed in April 2020, he was sixty-five years old. (Doc. No. 1 ¶ 12.) He also alleges in the Amended Complaint, filed in May 2021, that he was sixty-five years old. (Doc. No. 32 ¶ 12.) The court surmises that he was around sixty-three or sixty-four years old when the events giving rise to this lawsuit occurred.

[3] The plaintiff purports to "deny" this statement of fact "as stated," asserting that he was "'assigned' to work with multiple partners depending on the work that was required to be performed and/or the employees of the public works department who were available on a particular day." (Doc. No. 47, Resp. to Statement No. 10.) This statement is not supported by a citation to the record, as required by Rule 56(c)(1) and, therefore, may be deemed true under Rule 56(e)(2).

Hoppenstedt, he reassigned Solima to work with new partners either because of "complaints by Mr. Solima about his partner or complaints from other employees about Mr. Solima." (*Id.* ¶ 9.)

The plaintiff purports to deny the truth of that statement, but the record does not support his denial. It is undisputed that Solima was initially assigned to work with Randy Parker on a chipper crew. Randy Parker was Solima's designated "trainer" for on-the-job training. At the time, Parker had been employed by the City for approximately fifteen years and was over sixty years old. In November 2018, Solima requested to be assigned to a new partner. According to Solima, around that time, Hoppenstedt announced that he was switching up partners after there had been altercations between two other employees. By then, Solima had obtained his Commercial Driver's License and Randy Parker was going on vacation. The plaintiff thought that this would be "a good opportunity" to ask to be reassigned to a new partner. (Doc. No. 46-2, Solima Dep. 93.) He also testified, however, that he conveyed to Hoppenstedt various complaints about Parker when he spoke to him about changing partners. (*Id.* at 92–93 (confirming that he had made complaints about Parker to Hoppenstedt "there at the end of November when . . . Randy went on vacation"); *see also* Doc. No. 49, Solima Decl. ¶ 30 ("I requested Mr. Hoppenstedt assign me to work with someone else other than Randy Parker. Mr. Hoppenstedt asked me why I wanted to be assigned with someone other than Randy Parker. Hesitantly, I explained how Randy Parker was treating me when we were out in the truck all day.").)

Solima was partnered with another Public Works employee, Randall Richards. According to Hoppenstedt, Richards complained to him in November 2018 that Solima was condescending and difficult to work with, and he threatened to quit if he was forced to partner with Solima. (Doc.

---

Regardless, the plaintiff does not dispute that he was assigned to multiple partners over the course of his five-month tenure with the City.

No. 41-2 ¶¶ 10–11.) The plaintiff protests that he can neither admit nor deny the truth of private conversations between Hoppenstedt and Richards. (Doc. No. 47, Resp. to Statement Nos. 17–18.) However, Solima denies that he was condescending and further denies that Richards ever complained that he was. (Doc. No. 46-2, Solima Dep. 58.) Solima testified that he never had a problem getting along with Richards, but he did have a problem with the fact that Richards smoked in the truck. To resolve this problem, Solima approached Richards and asked him to smoke outside the truck while the plaintiff was loading branches into the chipper. Richards agreed. (Doc. No. 46-2, Solima Dep. 57–58.) Solima never complained to Hoppenstedt about Richards' smoking. (Doc. No. 41-3, Solima Dep. 138.) Richards later told Solima that he had gone to Hoppenstedt or another supervisor sometime after that conversation and asked for a new partner because Solima did not smoke. (*Id.* at 58.) Richards was partnered with someone else who "didn't show up for work," so he asked to be partnered with Solima again and told the supervisors that smoking would not be an issue. (*Id.*) So Solima and Richards were partnered again at some point. (*Id.*)

Hoppenstedt avers that, after Richards asked for a different partner, Solima was assigned to work with David Wray. (Hoppenstedt Decl. ¶ 14.) Solima testified that his relationship with Wray "instantaneously was bad." (Doc. No. 41-3, Solima Dep. 132.) Wray, too, smoked in the truck and generally tried to "make it as difficult as he could" for the plaintiff. (*Id.* at 133.) Solima denies that he "complained," but he admits that he eventually talked to Hoppenstedt about "David Wray's foul language, David Wray's bad attitude, David Wray driving off before Plaintiff was seated safely in the vehicle, David Wray removing the rake after Plaintiff had placed it on the truck where Plaintiff could quickly access it for the next chipping site." (Doc. No. 47, Pl.'s Resp. to Statement No. 22 (citing Doc. No. 46-2, Solima Dep. 134).) Hoppenstedt brought both Solima and Wray into his office together to try to mediate the problems. Wray admitted to everything Solima

had said about him and blamed his behavior on "tremendous stress at home." (*Id.* (citing Solima Dep. 134).) Hoppenstedt asked if they could get along, and Solima readily agreed that he could get along with Wray, so long as he did not smoke or vape in the truck. (Solima Dep. 134.) Solima and Wray shook hands at the end of the meeting, and Solima thought that they had put the issue behind them. (*Id.* at 134–35.) However, when Hoppenstedt asked Solima later that day how things had gone between them for the rest of the day, Solima reported that he had "tried to strike up conversation and all," but Wray "refused to say one word" to him and continued his basically hostile behavior. (*Id.* at 135.)

Shortly after that, Solima was reassigned to work with Randy Parker. (*Id.* at 134, 137.) He testified that he "sent an e-mail somewhere around that time frame . . . begging [Hoppenstedt] please don't put me with Randy. . . I don't need interference while I'm driving in the truck, somebody yelling and screaming that I can't even turn on a turn signal correctly or whatever . . . ." (*Id.* at 134; *see also id.* at 137 ("I think . . . I asked [Hoppenstedt] . . . please, please . . . don't put me back with Randy, but I worked with Randy.").)

Because Solima had asked not to be partnered with Parker anymore, Hoppenstedt arranged a meeting with Solima, Parker, and two other Public Works employees, Rich Richardson and Ernie Martin, on January 7 or 8, 2019. (Doc. No. 46-2, Solima Dep. 141.) Solima reported to Hoppenstedt that Parker had been verbally and physically abusive when they were first partnered together in August or September, and, in fact, much of the meeting apparently concerned an event that took place during that time frame between Solima and Parker, whose versions of the event differed strikingly. According to Solima, on a day back in August or September, he, Parker, and another Public Works employee, Steven Tomlinson, were assigned to clean up a big tree that had come down in a storm. Solima was attempting to "maneuver[] this log" into the chipper, when

Parker hit him on his right shoulder, causing him to fall into the log and sustain substantial bruising. (*Id.* at 60, 139.) Parker denied ever hitting or pushing Solima and claimed, instead, that he had "lightly tapped" him on the shoulder to let him know he (Parker) was there. (*Id.* at 141.) Solima testified that Parker's version of this event was "[c]ompletely untrue." (*Id.*)

Hoppenstedt talked with Tomlinson about the event, but Tomlinson did not recall an altercation between Solima and Parker. According to Parker, there was no way Tomlinson would have known about it, because he was some distance away with his back turned. (*Id.* at 60.) Even though Hoppenstedt was unable to confirm what exactly had happened, he counseled Parker and gave him a verbal warning. (Doc. No. 41-4, Hoppenstedt Dep. 31–32.) The City's HR Director, Mike Worsham, however, testified that, "because the two stories were completely different, . . . there wasn't enough evidence to take any disciplinary action with Mr. Parker." (Doc. No. 46-4, Worsham Dep. 24.)

Hoppenstedt held another meeting with Solima on January 15, 2019, which resumed on the following day. The meeting on January 16, 2019 lasted about an hour. Hoppenstedt testified that he construed many of Solima's statements on January 16 to contradict statements Solima had made on January 15; he also felt that Solima was unable to provide him with enough information to substantiate his complaints about other employees in the department. (Doc. No. 41-4, Hoppenstedt Dep. 19–21; Doc. No. 41-2, Hoppenstedt Decl. ¶ 28.) The plaintiff, citing to an exhibit to his deposition that is not in the court's record, denies that he made contradictory statements. (Doc. No. 47, Pl.'s Resp. to Statement No. 36.)[4]

---

[4] Solima also denies that he did not give Hoppenstedt sufficient information to corroborate his complaints, referencing an irrelevant event that Hoppenstedt did not raise and citing to a portion of his own deposition testimony regarding the same matter, without providing any context. (Doc. No. 47, Pl.'s Resp. to Statement No. 37 (citing Solima Dep. 56).)

On January 16, 2019, Hoppenstedt made the decision to terminate Solima's employment, prior to the conclusion of the plaintiff's probationary period. Hoppenstedt testified that he terminated Solima based on his belief that Solima was not a "good fit for the position" and the position was not a "good fit for him," in particular because Solima did not get along well with his co-workers. (Doc. No. 41-4, Hoppenstedt Dep. 16–17.) Hoppenstedt also stated that he had lost trust in Solima due to the inconsistencies in the complaints he reported to Hoppenstedt. (Doc. No. 41-4, Hoppenstedt Dep. 23.) Solima was terminated effective January 16, 2019. (Doc. No. 41-1, Bednar Decl. ¶ 25.)

Solima disputes Hoppenstedt's stated reasons, claiming that, during his employment, he was told "almost daily" "how good" he was doing, how well he was fitting in, and how much the department appreciated having him there. (*See* Doc. No. 46-2, Solima Dep. 234.) He also disputes that trust was an issue, as this was something he did not hear until Hoppenstedt's deposition. He insists that, if trust had truly been an issue, Hoppenstedt would not have given a verbal warning to Parker. (Doc. No. 47, Pl.'s Resp. to Statement No. 41.) According to Solima, Hoppenstedt terminated his employment after he "raised the issues of harassment and bullying by Randy Parker and smoking by David Wray." (Doc. No. 49, Solima Decl. ¶ 36.) Hoppenstedt told Solima he "had to let him go for the good of the department." (*Id.*)

Following Solima's termination, the City had difficulty filling his position. According to Hoppenstedt, it is common for a maintenance worker position to remain unfilled for a "lengthy" period of time. (Doc. No. 41-2, Hoppenstedt Decl. ¶ 34.) There was already an open position in the department when the plaintiff was terminated, leaving a second open position. The City acknowledges that these positions were eventually filled, but it claims that Solima was not "directly replaced." (Hoppenstedt Decl. ¶ 33.) The plaintiff denies that assertion and asserts that

the City hired three new employees ranging in age from twenty-three to thirty-six years old in August and September 2019. (Doc. No. 47, Pl.'s Resp. to Statement No. 45; see also Doc. No. 54, Def.'s Resp. to Statement Nos. 33, 34, 41, 42, 44, 45.)[5]

**B.     The Plaintiff's Statement of Additional Facts**

The plaintiff submitted a Statement of Additional Undisputed Material Facts (Doc. No. 48), to which the defendant has responded (Doc. No. 54). The court's Local Rule 56.01 permits a non-moving party to submit a "*concise* statement of any additional facts that the non-movant contends are material and as to which the non-movant contends *there exists a genuine issue to be tried.*" L.R. 56.01(c) (emphasis added). The plaintiff's Statement of Additional Undisputed Material Facts—195 of them—is not concise, and it largely consists of additional facts as to which he contends there is no dispute. Moreover, the vast majority of the factual statements are simply immaterial. Those additional facts that have any remote relevance to the plaintiff's claims in this lawsuit include the following.

The plaintiff told Todd Hoppenstedt in October or November 2018 that he was referred to by other employees as "Old Dave." (Doc. No. 46-2, Solima Dep. 64.) Solima told Hoppenstedt about this after a regular morning meeting during which Hoppenstedt had referred to Randy Parker and Solima as the "geriatric crew." (*Id.* at 68.) Hoppenstedt made that comment in the context of noting that Parker and Solima were out-performing other crews in the performance of a particular task. (*Id.*) Hoppenstedt "kind of laughed about it" and, when the plaintiff told him about being called "Old Dave," told him he "needed to stand up for [him]self." (*Id.* at 64.) At a company dinner, David Wray introduced Solima to his wife as "Old Dave" in front of Hoppenstedt. (*Id.* at 65.) A

---

[5] Although the plaintiff's response to the defendant's Statement of Undisputed Fact No. 45 is not supported by any citation to the evidentiary material in the record, the plaintiff has supplied evidentiary support for this assertion and refers to it in his own Statement of Additional Facts.

day or so after the dinner, the department superintendent, Rich Richardson, approached Solima to tell him that "everybody . . . got nicknames." (*Id.* at 65.)

The plaintiff maintains that there were numerous "comparator" employees who were treated more favorably than he was. These employees ranged in age from twenty-one years old to mid-thirties. They were hired in September 2017, August 2019, September 2019, January 2020, and June 2020. As reflected in their personnel files, some of them were hired despite having criminal convictions, records of being involved in traffic accidents, and suspended licenses. Some of them had negative performance evaluations; others had no performance evaluations in the personnel files. According to the City's HR Director, the City was "regularly recruiting, and, even during those times when [the City was] fully staffed," it would accept applications for maintenance workers. (Doc. No. 46-4, Worsham Dep. 20.)

Worsham testified that it was the department director's job to make a decision at the end of any employee's probationary period whether to recommend regular status, full time, part time, extension of probation, or discharge. (*Id.* at 25.) Hoppenstedt never raised any concerns about the plaintiff's job skills, knowledge, performance, punctuality, attendance, reliability, concern for safety, or ability to work with others with Worsham.

Hoppenstedt testified that he had terminated other probationary employees, including one who had a traffic accident in a city vehicle and inaccurately reported what happened. (Doc. No. 46-3, Hoppenstedt Dep. at 65–66.) Another probationary employee was put on extended probation to give him time to obtain his commercial driver's license. (*Id.* at 66–67.)

Addressing why he believed Solima was not a good fit for his job, Hoppenstedt explained that part of the problem was that the plaintiff's "management experience was just a part of him." (Doc. No. 46-3, Hoppenstedt Dep. 17.) As a result, Hoppenstedt believed that Solima "often had

feedback and suggestions about how things should be done differently, he was trying to work in a role that he wasn't hired for." (*Id.*) Hoppenstedt also testified that he did not learn about most of the plaintiff's complaints about his co-workers until "toward the end of his time" with the City, rather than when they occurred. (*Id.*) However, Hoppenstedt claimed that he had at least four conversations with the plaintiff during his five-month tenure about his problems with his co-workers, but Hoppenstedt did not document these conversations. (*Id.* at 27–28.) Hoppenstedt stated: "Oftentimes we would have a discussion after he would make a remark about a previous assigned partner and his inability to work with one person, and wanting to basically cherry pick his next partner. . . . I also told him I was running out of partner combinations." (*Id.* at 27.)

There is no dispute that the plaintiff never received a performance evaluation. There is no dispute that Hoppenstedt never raised any issues or concerns with HR about the plaintiff's knowledge, job skills, quality of work, attendance or punctuality, ability to get along with others, dependability or reliability, or concern for safety. The plaintiff was never told that there was any problem with his job performance.

## III. PROCEDURAL BACKGROUND

Solima initiated this lawsuit in April 2020, purporting to assert age discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981, neither of which prohibits age discrimination. In response to the defendant's Motion for Judgment on the Pleadings, the court granted Solima leave to amend his pleading to assert claims under the ADEA and 42 U.S.C. § 1983. (*See* Doc. No. 31.) The Amended Complaint was filed on May 7, 2021.

The defendant has now filed its Motion for Summary Judgment, supporting Memorandum, Statement of Undisputed Material Facts, and the evidentiary material cited in the Statement of Undisputed Material Facts. (Doc. Nos. 39, 40, 41, 42.) The plaintiff filed an "Objection" to the Motion for Summary Judgment, Memorandum of Law in support of his Objection, a "Response

and Objection" to the Statement of Undisputed Material Facts, and his own evidentiary material. (Doc. Nos. 45, 46, 47, 49.) As noted, he also filed a separate Statement of Additional Material Facts as to which he contends there is no material factual dispute. (Doc. No. 48.) The defendant filed a Reply and a Response to the Statement of Additional Facts. (Doc. Nos. 53, 54.)

The defendant seeks summary judgment on the grounds that: (1) the plaintiff lacks direct evidence of age discrimination and cannot establish a *prima facie* case of age discrimination using direct evidence, because he cannot show that he was replaced by someone outside the protected class or treated less favorably than similarly situated non-protected employees; (2) even if could establish a *prima facie* case, he cannot show that the City's legitimate, non-discriminatory reason for terminating him is pretext for age discrimination; (3) the plaintiff cannot establish a violation of his right to procedural due process, because the plaintiff, as a probationary employee, did not have a property interest in continued employment, under state law, and therefore had no right to any process in connection with being terminated; and (4) likewise, the plaintiff had no substantive due process right to continued employment or any kind of hearing or appeal rights.

The plaintiff has responded to most of these arguments and generally contends that genuine issues of material fact preclude summary judgment in favor of the defendant.

## IV. DISCUSSION

### A. ADEA Discrimination Claim

#### 1. *Legal Standard*

The ADEA prohibits employers from terminating employees "*because of* such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). To satisfy this requirement, the plaintiff must "prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). "This requires showing that age was *the* determinative reason [the plaintiff

was] terminated; that is, [he] must show 'that age was the "reason" that the employer decided to act.'" *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (quoting *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014), and *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350–51 (2013)) (emphasis in the original), *cert. denied sub nom. Pelcha v. Watch Hill Bank*, 142 S. Ct. 461 (2021). Under Sixth Circuit and Supreme Court precedent, establishing "but-for cause" requires plaintiffs to show that age "had a determinative influence on the outcome" of the employer's decision-making process. *Id.* at 324 (quoting *Gross*, 557 U.S. at 176). Thus, to avoid summary judgment in this case, Solima must establish the existence of a genuine dispute of material fact that, if resolved in his favor, could persuade a reasonable juror that age was the but-for cause of his termination. *See id.*

A plaintiff can establish his ADEA claim through either direct or circumstantial evidence. *Id.* "Direct evidence is evidence that proves the existence of a fact without requiring any inferences" to be drawn. *Id.* (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). "Conversely, circumstantial evidence requires the factfinder to draw inferences from the evidence presented to conclude that the plaintiff was terminated based on age." *Id.*

If a plaintiff lacks direct evidence, he may attempt to show age discrimination with circumstantial evidence. In this Circuit, the Sixth Circuit has continued to endorse the "three-step burden shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06 (1973)," for analyzing employment discrimination claims. *Pelcha*, 988 F.3d at 324. The first step of this analysis requires the plaintiff to establish a *prima facie* case of discrimination. If he is able to do so, the burden of production shifts to the employer to identify a legitimate, nondiscriminatory reason for the termination. *Id.* at 325. Once the employer identifies a reason, the burden shifts back

to the plaintiff to prove that the employer's reason is simply pretext. *Id.* If the plaintiff prevails at that step, the factfinder may reasonably infer discrimination. *Id.*

### 2. Whether the Plaintiff Has Direct Evidence of Discrimination

As the defendant points out, Solima does not actually respond to its argument that he lacks direct evidence of age discrimination. Solima does, however, point to evidence in the record in his Statement of Additional Facts that he apparently believes constitutes direct evidence of age discrimination. This evidence consists of his testimony that his co-workers referred to him as "Old Dave," a nickname to which he objected, and that his supervisor, Todd Hoppenstedt, referred to him and Randy Parker on one occasion as his "geriatric crew," in the context of complimenting them on completing a task more quickly than the other crews. (*See* Doc. No. 48 ¶¶ 1–2.) The plaintiff also testified that Hoppenstedt knew that other employees were calling him "Old Dave" but simply told Solima he needed to "stand up" for himself. (*Id.* ¶ 4.)

The Sixth Circuit has identified four factors to be considered in determining the "materiality of allegedly discriminatory statements" that a plaintiff characterizes as direct evidence of discrimination, none of which is dispositive: "(1) whether the statements were made by a decision-maker . . . ; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination." *Pelcha*, 988 F.3d at 325 (quoting *Diebel v. L & H Res., LLC*, 492 F. App'x 523, 527 (6th Cir. 2012)). "This is a high bar." *Id.* "In reviewing direct evidence, we look for 'evidence from the lips of the defendant proclaiming his or her . . . animus.' Inferences are not permitted." *Id.* at 326 (quoting *Diebel*, 492 F. App'x at 526–27).

Applying these factors here, the plaintiff does not claim that his supervisor or any decisionmakers referred to him as Old Dave; the comments were not related to any decision-

making process; the reference to his age has no bearing on his ability to perform his job and it does not, standing alone, establish animosity toward older workers. The plaintiff's being called Old Dave by his co-workers does not constitute direct evidence of age discrimination.

Likewise, Hoppenstedt's reference to Solima and Parker as his "geriatric crew," although made by the individual responsible for terminating the plaintiff's employment, was not related to the decision-making process, and it constitutes a single, isolated remark made in the context of complimenting the plaintiff's work performance. The comment was presumably made less than five months prior to the plaintiff's termination, since he was only employed by the defendant for approximately five months, but the plaintiff has not shown that the comment was made acutely near in time to his termination or that it has any relation to Hoppenstedt's decision to terminate him.

The Sixth Circuit has emphasized that, "[i]n reviewing direct evidence, we look for 'evidence from the lips of the defendant proclaiming his or her . . . animus.'" *Pelcha*, 988 F.3d at 326 (quoting *Diebel*, 492 F. App'x at 526–27). Hoppenstedt's isolated comment hardly proclaimed his animus toward older employees, and his knowledge that other employees called the plaintiff Old Dave does not give rise even to an inference that the plaintiff's termination was age-related, much less qualify as direct evidence of such. The court finds, in sum, that the plaintiff has failed to point to direct evidence of discrimination based on age.

3.    *Whether the Plaintiff Can Establish a Prima Facie Case*

In the absence of direct evidence, the court turns to whether the plaintiff can establish his claim through indirect evidence, under the *McDonnell Douglas* framework. To establish a *prima facie* case of age discrimination, the plaintiff must show that he (1) was a member of a protected class (older than 40 years old); (2) suffered an adverse employment action; (3) was qualified for the position held; and (4) was replaced by someone significantly younger than he or, alternatively,

that similarly situated non-protected employees were treated more favorably than he. *Id.* at 326 (citations omitted); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). It is well established that the plaintiff's burden at this step is "light," "easily met," and "not onerous." *Pelcha*, 988 F.3d at 326 (citations omitted).

For purposes of summary judgment, the City does not dispute that the plaintiff can show the first three elements of a *prima facie* case: (1) he is a member of a protected class by virtue of his age; (2) he suffered an adverse employment action when he was terminated; and (3) he was qualified for the position he held. The defendant argues that the plaintiff cannot show either that he was replaced by someone outside the protected class or that he was treated less favorably than similarly situated non-protected employees.

In support of its argument that the plaintiff "cannot prove that he was replaced by someone under the age of 40," the City argues that the plaintiff, at his deposition, was unable to identify the names or ages of any employee who replaced him. (Doc. No. 40, at 13.) The defendant does not explain, however, why Solima would be required to have that information at his disposal at the time he was deposed. Moreover, it is now undisputed that the City hired three maintenance workers, all of whom were under age forty and two of whom were under thirty, approximately seven months after Solima's termination. (*See* Doc. No. 54, Def.'s Resp. to Statement Nos. 33, 34, 41, 42, 44, 45.) The City nonetheless argues that there was already an open position for a maintenance worker when the plaintiff was terminated, meaning that there were two such positions after his termination. (Doc. No. 40, at 13.) While it concedes that these positions were "ultimately filled" seven or eight months after the plaintiff's termination, the City argues that the plaintiff was not "directly replaced," because the City had difficulty filling maintenance worker positions generally, and it is "common" for a maintenance worker position to remain unfilled for a lengthy

period of time. (*Id.* (citing Doc. No. 41-2, Hoppenstedt Decl. ¶¶ 33, 34).)

In the Sixth Circuit, a "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). The defendant does not actually argue here that Solima's job duties were distributed among other maintenance workers, and it does not argue that the position he vacated was not ultimately filled. It seems to be arguing that, because the position was not filled immediately, the plaintiff cannot show that he was actually "replaced" by a younger employee. But the City does not point to any caselaw supporting its position that, simply because it took some time to find a permanent replacement for a terminated employee, the terminated employee was not actually replaced. The court finds that there is, at a minimum, a material factual dispute as to whether the plaintiff was replaced by a substantially younger employee. Consequently, the plaintiff has succeeded in stating a *prima facie* case of age discrimination, and the court has no need to address the question of whether the plaintiff can show that he was treated less favorably than similarly situated non-protected employees.

4. *The Defendant's Legitimate, Non-Discriminatory Reason for Terminating the Plaintiff*

Because Solima has established a *prima facie* case of age discrimination, the burden shifts to the City to articulate a non-discriminatory reason for Solima's termination, which it has done. The City states that Solima was terminated because he was not a "good fit for the position" and the position was not a "good fit for him," in particular because he did not get along well with his co-workers. (Doc. No. 41-4, Hoppenstedt Dep. 16–17; *see also* Doc. No. 40, at 15.) Hoppenstedt

also testified that he no longer trusted the plaintiff, due to his perception that the plaintiff's statements at the meeting on January 15 conflicted with additional statements made when the meeting resumed on January 16, 2019. (Doc. No. 41-2, Hoppenstedt Decl. ¶ 31.)

5.  *Whether the City's Reason Is Pretext for Discrimination*

The plaintiff concedes that the defendant has proffered a legitimate, non-discriminatory reason for his discharge. (Doc. No. 46, at 15.) Accordingly, the burden shifts back to Solima to show that this reason is a pretext to conceal that the true motive for his termination was his age. "Put simply, the 'commonsense' question here is: 'did the employer fire the employee for the stated reason or not?'" *Pelcha*, 988 F.3d at 326 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). The Sixth Circuit recognizes that "[p]laintiffs typically show pretext in one of three ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that the proffered reasons were insufficient to motivate the employer's action.'" *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). However, these three categories are not the exclusive means by which a plaintiff can show pretext. Rather, they are simply a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.* (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)). Regardless of what course he takes, the "plaintiff must articulate some cognizable explanation of how the evidence [he] has put forth establishes pretext." *Id.*

Here, the plaintiff first argues that "the real reason for his termination on January 16, 2019 was his complaints of harassment to Mr. Hoppensted[t] about ongoing harassment in the workplace by Randy Parker and David Wray." (Doc. No. 46, at 15.) This argument is utterly baffling, insofar as it appears on its face to concede that the plaintiff was *not* terminated because of his age but, instead, because of his complaints about his co-workers. Solima elaborates,

however, asserting that purported

> "weaknesses, implausibilities, inconsistencies, incoherences, [and] contradictions" produced in discovery and also witness testimony . . . establish sufficient evidence that his termination was not motivated by Hoppenstedt's stated reasons of "not fitting in" or "not a good fit" for the City, so that the only plausible reason left for his termination was the reports of harassment and complaints about being referred to as "the geriatric crew" and "Old Dave."

(Doc. No. 46, at 16.)

In other words, the plaintiff appears to be arguing that he reported co-worker harassment based on age and was fired in retaliation for making that report. He then goes on to discuss caselaw concerning "protected activity" and "retaliatory discharge," apparently in support of a retaliation claim. (*Id.* at 16–17.) However, in the course of this discussion, he points out that he was terminated shortly after complaining to Hoppenstedt about David Wray's smoking in the City's truck, in violation of City policy, while Wray was never disciplined for violating City policy. His reporting Wray's smoking has nothing to do with age. Likewise, in his Amended Complaint, he alleges that he was terminated after complaining about an employee who "smoked in the truck" (presumably Wray), and about another employee (presumably Randy Parker) who "used profanity and yelled at Plaintiff" and was "verbally and physically abusive" toward him. (Doc. No. 32 ¶¶ 20, 24, 26.) He argues now, as he did in the Amended Complaint, that instead of investigating his complaints or disciplining the other employees, Hoppenstedt fired him after he "raised the issues of the harassment and bullying by Randy Parker and the smoking by David Wray," (Doc. No. 49, Solima Decl. ¶ 36; *see also* Am. Compl., Doc. No. 32 ¶¶ 21–29; *see also* Doc. No. 46, at 17 ("Plaintiff raised the grievance [about Wray's smoking] with Mr. Hoppenstedt. Mr. Hoppenstedt did not discipline David Wray for smoking in the truck in violation of the City Rules and Regulations. . . . There was never an issue with [Solima] until [he] raised concerns of harassment [by Wray and Parker] with Mr. Hoppenstedt.").)

This argument does nothing to establish that Hoppenstedt's proffered reason for the plaintiff's discharge were pretextual. Rather, it serves to substantiate, rather than contradict, Hoppenstedt's conclusion that Solima was not a good fit for the job because he did not get along well with his co-workers. Along the same lines, insofar as the plaintiff attempts to dispute, as a factual matter, that he complained about multiple employees or that he could not get along with other employees, thus attempting to call into question the truth of Hoppenstedt's stated reason for his termination, that attempt fails as well. While the plaintiff attempts to dispute that he complained about other employees, he has repeatedly admitted that he complained about other employees, particularly Parker and Wray. (*See, e.g.*, Am. Compl., Doc. No. 32 ¶¶ 21, 26 (alleging that the plaintiff "requested to be paired" with employees who did not smoke and who were not "verbally and physically abusive"); Doc. No. 46-2, Solima Dep. 92–93 (confirming that he had made "complaints" about Parker to Hoppenstedt "there at the end of November [2018] when . . . Randy went on vacation" and in January 2019); *id.* at 134, 137 (confirming that he emailed Hoppenstedt "begging" Hoppenstedt not to partner him with Parker, because he did not want to work with "somebody yelling and screaming that I can't even turn on a turn signal correctly or whatever"); Doc. No. 49, Solima Decl. ¶ 30 ("I explained how Randy Parker was treating me when we were out in the truck all day."); *id.* ¶ 35 ("I told Mr. Hoppenstedt about David Wray smoking in the truck."); *id.* ¶ 36 ("Mr. Hoppenstedt terminated my employment after I raised the issues of the harassment and bullying by Randy Parker and the smoking by David Wray.").)[6]

---

[6] To be clear, the Amended Complaint does not set forth a claim for retaliation in violation of the ADEA, and, even if it had, the plaintiff's allegations now do not establish a *prima facie* case of ADEA retaliation. Specifically, Solima has not shown that he engaged in activity protected by the ADEA by expressing "opposition to an unlawful employment practice." *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007); *see also Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 511 (6th Cir. 2016). This is because he has repeatedly alleged that he was terminated for complaining about Parker's mistreatment of him and Wray's smoking and other unpleasant

The court accepts as true that Solima's complaints about the other employees were justified and legitimate, but that conclusion does not nullify the fact that Solima, in fact, made complaints about his co-workers. And, while his termination may have been unfair and unwarranted, Solima has not shown that his termination for complaining about other employees was illegal or discriminatory. The law is clear that an employer may fire an at-will employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Pelcha*, 988 F.3d at 329 (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020)) (internal quotation marks omitted).

Finally, Solima asserts that Hoppenstedt never mentioned that he had lost trust in the plaintiff until Hoppenstedt's deposition. The plaintiff argues that Hoppenstedt's "changing rationale" for his termination decision is evidence of pretext. However, Hoppenstedt did not change his rationale; he simply added an additional reason for his decision. The Sixth Circuit has stated that "providing additional, non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications." *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 891 (6th Cir. 2020) (quoting *MacDonald-Bass v. J.E. Johnson Contracting, Inc.*, 493 F. App'x 718, 726 (6th Cir. 2012)).

The plaintiff has effectively admitted that he was fired for complaining about Wray's smoking in the truck and Parker's physical and verbal abuse of him, which substantiates Hoppenstedt's perception that the plaintiff complained about his co-workers and was not a good

---

behavior. He does not actually contend that his termination was related to his complaining to Hoppenstedt about being called "Old Dave" by his co-workers or about Hoppenstedt's reference to his being part of the "geriatric crew." Moreover, complaining about these two things would not qualify as specifically "objecting to discriminatory conduct against [him] based on [his] membership in a protected class." *Braun*, 828 F.3d at 511 (quoting *Balding–Margolis v. Cleveland Arcade*, 352 F. App'x 35, 45 (6th Cir. 2009)).

fit for the job. While the plaintiff takes issue with Hoppenstedt's failure to investigate his complaints or to discipline the other employees, he has not shown that Hoppenstedt's proffered reasons for his termination were pretextual, and he has not pointed to any evidence in the record that remotely supports an inference that he was terminated because of his age. The defendant is entitled to summary judgment and dismissal of the plaintiff's age discrimination claim.

### B.    Due Process Claims Under 42 U.S.C. § 1983

In the Amended Complaint, the plaintiff asserts claims under 42 U.S.C. § 1983 for violation of his rights to both procedural due process and substantive due process, as protected by the Fourteenth Amendment to the United States Constitution, apparently based on his not having been granted a "fair and impartial hearing" either before or after his termination. (*See* Am. Compl., Doc. No. 32 ¶ 51.)

#### a)    *Procedural Due Process*

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. To establish a procedural due process claim, the plaintiff must show that "(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) (citing *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999)). The only question at issue here is whether the plaintiff had a protected property interest in his public employment.

 "A government position, by itself, does not constitute a protected property interest." *Jones v. Perry Cty. Fiscal Court*, 185 F. Supp. 3d 947, 955 (E.D. Ky. 2016) (quoting *Bailey v. Floyd Cty. Bd. of Educ.*, 106 F.3d 135, 141 (6th Cir. 1997)). Rather, government employment may give rise to a protected property interest only "when the employee is 'entitled' to continued employment.'"

*Nunn v. Lynch*, 113 F. App'x 55, 58–59 (6th Cir. 2004) (quoting *Bailey*, 106 F.3d at 141). Whether a property interests exists primarily depends on state law. *Bailey*, 106 F.3d at 141. Therefore, a government employee asserting a protected property interest in his position must "point to some statutory or contractual right conferred by the state which supports a legitimate claim to continued employment." *Id.* An at-will employee, or an employee who may be terminated without cause, does not have a protected property interest. *Id.*

Government employees with a "protectable property interest in their jobs are ordinarily entitled to pre-deprivation notice of the charges, an explanation of the employer's evidence, and an opportunity to present their account of the events." *Id.* (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir. 1990)). On the other hand, a government employee who does not have a property interest in his position is "not entitled to any pre-deprivation process whatsoever." *id.* (citing *Williams v. Kentucky*, 24 F.3d 1526, 1537 (6th Cir. 1994)).

In support of its Motion for Summary Judgment, the defendant argues that, under the clear language of Article IX of the City's Rules and Regulations, the plaintiff, as a probationary employee of the City, could be fired "[a]t any time during or upon the conclusion of the initial probationary period, . . . with or without cause and with no right to appeal as provided for regular employees." (Doc. No. 40, at 18 (quoting Doc. No. 41-1, at 30).) Accordingly, the City argues, "Plaintiff cannot establish that he was entitled to or deprived of procedural due process rights." (*Id.*)

In response, the plaintiff appears to be arguing that Article I of the City's Rules and Regulations created a property interest in his continued employment, insofar as it contains "clear language" that its provisions apply to "all employees." (*See* Doc. No. 46, at 13.) The plaintiff

interprets this provision to mean that the progressive disciplinary policy embodied in Article XII should apply to "all employees" and that he was terminated in violation of that policy. However, Section A of Article XII, "Application," expressly refutes the plaintiff's proposed interpretation. It states: "This Article applies to all City employees; provided, however that a probationary employee may be dismissed as provided for in Article IX with no right to appeal as provided for regular employees herein." (Doc. No. 41-1, at 43.)

Article IX conclusively establishes that the plaintiff, as a probationary employee, was an at-will employee of the City who could be terminated at any time "with or without cause." (*Id.* at 25.) As a probationary employee, therefore, he had no protected property interest in his employment and was not entitled to any process whatsoever upon his termination. His claim that his termination without the right to a hearing violated his right to procedural due process is without merit, and the defendant is entitled to summary judgment on this claim.

> b)      *Substantive Due Process*

"Substantive due process 'prevents the government from engaging in conduct that shocks the conscience' . . . or interferes with rights implicit in the concept of ordered liberty[.]'" *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th Cir. 2002) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). With regard to the scope of the liberty rights protected, the Sixth Circuit has explained:

> Over time, the Supreme Court has construed the substantive component of the Due Process Clause to protect two types of "liberty." It incorporates most of the guarantees of the Bill of Rights—which originally restricted only the Federal Government—and protects these rights from state infringement. And it protects other fundamental rights not expressly mentioned in the Bill of Rights but implicit in the concept of ordered liberty and deeply rooted in this Nation's history and tradition—including personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.

*Flaskamp v. Dearborn Pub. Sch.*, 385 F.3d 935, 941 (6th Cir. 2004) (internal citations and

quotation marks omitted); *see also Seal v. Morgan*, 229 F.3d 567, 574–75 (6th Cir. 2000) ("The list of fundamental rights and liberty interests . . . is short, and the Supreme Court has expressed very little interest in expanding it." (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). "While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring) (internal citation omitted):

The Sixth Circuit has never held that the right to maintain public employment is subject to substantive due process protection, even when the public employee has a protected property interest in such employment for purposes of procedural due process. *See Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir. 1992) ("[P]laintiffs' statutory right to be discharged only for cause is not a fundamental interest protected by substantive due process."); *Williams v. City of Franklin*, 586 F.Supp.2d 890, 900 (M.D. Tenn. 2008) (dismissing the plaintiff's substantive due process claim premised on a purported "liberty interest and a property interest in continued employment" with the defendant city, stating: "The Sixth Circuit has repeatedly rejected attempts to include property interests in employment among the interests protected by substantive due process.").

The defendant argues, based on these principles, that it is entitled to summary judgment on the plaintiff's substantive due process claim. In response, the plaintiff simply asserts, with no citation to the law, that he was deprived of "substantive due process secured by the Personnel Rules and Regulations that apply to Plaintiff's employment and provided to him through Tennessee law [and] the Due Process clause . . . as applied to his employment with the City of Brentwood." (Doc. No. 46, at 1.)

The court finds, as a matter of law, that the plaintiff has no substantive due process right to continued public employment. The defendant is entitled to summary judgment on this claim as well.

## V. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge